**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **ASAF BEN OZ and DIRECT DIAMOND NETWORK, INC.** | ) | **CIVIL ACTION NO.** |
| | ) | _____ |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| **RICHARD RUTTA, JESSE RUTTA and DGA VAULT CORP.** | ) | |
| | ) | |
| **Defendants.** | ) | **JANUARY 13, 2021** |

## THE PARTIES

1.  Plaintiff Asaf Ben Oz (hereinafter "Mr. Oz") is an adult individual residing at 28 Elmcrest Drive, Dallas, Luzerne County, Commonwealth of Pennsylvania.

2.  Plaintiff Direct Diamond Network, Inc. (hereinafter "Direct Diamond") is an S corporation organized and existing under the laws of the Commonwealth of Pennsylvania, now solely owned by Mr. Oz, with a principal place of business located at 28 Elmcrest Drive, Dallas, Luzerne County, Commonwealth of Pennsylvania.

3.  Defendant Richard Rutta ("Rutta Sr.") is an adult individual having an address of Yismach Melech 19, Jerusalem, Israel 9412113.

4.  Defendant Jesse Rutta ("Rutta Jr.") is an adult individual having an address of 55 West 95th Street, Apt. 2, New York, New York.

5.  Defendant, DGA Vault Corp. ("DGA") is a corporation located at 429 West 53rd Street, 4th Floor, New York, New York.

## JURISDICTION AND VENUE

6.  This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332(a) which provides in relevant part: "[t]he district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between (1) citizens of different States…. and (3) citizens of different states and in which citizens or subjects of a foreign state are additional parties." Moreover, pursuant to 28 U.S.C. §1332(a), complete diversity exists.



1

7. Venue lies with this Court pursuant to 28 U.S.C. §1391(b)(2).

## FACTUAL ALLEGATIONS

8. In May 1999, Mr. Oz formed Direct Diamond for the purpose of trading diamonds wholesale utilizing internet marketing channels which would create substantial savings to the consumer using his knowledge of and connections in the diamond industry in the United States and Israel, with a focus on creating an innovative internet platform for marketing and sales of loose certified diamonds.

9. The intent of the business was to utilize Mr. Oz's computer programming, IT, and other skills, along with years of experience in the diamond industry, contacts, and knowledge of the diamond industry trade secrets and members, in order to bring together some of the finest diamond manufacturers and diamond wholesalers from around the world, and to conduct marketing and sales of high quality loose certified diamonds to wholesalers, retailers, and individuals, through face to face meeting traveling across the country, and sophisticated on line marketing systems. This idea was developed from the ground up investing years of time in research and development and substantial financial resources. The objective was to save money to the end user/buyer by cutting many middlemen and added cost and lowering the final price of the diamonds. By doing so, Direct Diamond became one of the most competitive companies on diamonds prices in the world.

10. In 2007, as Direct Diamond grew and expanded its operation to the New York City diamond district, a family friend (Rutta Sr.) expressed great interest in wanting to become involved in the corporation.

11. After six months of extensive negotiations between Mr. Oz and Rutta Sr. and their respective attorneys, they signed a Shareholders' Agreement (the "Agreement") related to the operation of Direct Diamond. *See* Agreement, attached hereto as **Exhibit 1**.

12. The Agreement created legal obligations for both parties. In particular, Mr. Oz was the Chief Operating Officer/President and Rutta Sr. was the Vice-President and Chief Financial Officer. In particular, Rutta Sr. was to advance the capital necessary to purchase diamonds that were to be held in Direct Diamond's inventory pending resale to third parties and to provide funds for corporate operations.

13. Immediately following the finalization of the Agreement, Rutta Sr. advised Mr. Oz that his financial obligations to Direct Diamond were to be funded by Rutta Sr.'s enterprise operations in Israel. Upon request for more information with regard to the source of the funds, Mr. Oz learned that Rutta Sr. was involved in a scheme that took place in Israel and the United



States whereby fictitious and forged academic certificates were issued to applicants, who then utilized the fictitious diplomas in their personal business and/or lives.

14. As member of the Diamond Dealer Club in New York City, a member of the Israeli Diamond Exchange, and member of the World Federation of Diamond Burses, in addition of acting as the AML (anti money laundering) officer for the Corporation, Mr. Oz realized that the source of funds Rutta Sr. was willing to utilize for Direct Diamond were going to come from illegal activity, that Mr. Oz refused the funding. Mr. Oz believed that Rutta Sr. was attempting to launder such illegal funds through Direct Diamond and transfer it into the United States in the form of inventory for the company.

15. As a result, friction developed between Mr. Oz and Rutta Sr.

16. Mr. Oz that was led to believe by Rutta Sr. that he ended his involvement in that scam following a conversation in 2007. Eventually, Rutta Sr. and his scam were uncovered by authorities in Israel and halted. All those involved were brought to justice in court in Jerusalem. Currently, in the United States, a Federal investigation is still ongoing by the IRS and Department of Treasury.

17. Following this confrontation, Rutta Sr. became very disinterested in serving as C.F.O. of the Direct Diamond. From 2007 until 2014, Rutta Sr. stopped performing any work on behalf of Direct Diamond, and rarely, if ever, showed up for work. Mr. Oz ran Direct Diamond himself during this time, fulfilling both his own obligations and many that he had expected Mr. Rutta to perform.

\#

18. On December 22, 2014, while Direct Diamond is in the midst of its busiest time of the year, Rutta Sr. submitted his *unsigned* resignation from Direct Diamond. *See* Letter of Termination, attached hereto as **Exhibit 2**. The resignation can also be deemed to be ineffective as well because it was not sent via certified mail/return receipt requested. It was only sent by certified mail. (Section 9 of the Agreement calls for the election to terminate/resign to be sent in writing by certified mail, return receipt requested).

19. Rutta Sr. sent his *unsigned* letter of resignation, with certain time demands asserted therein as per the Shareholder's Agreement, to Direct Diamond at Mr. Oz's old residence in Harvey's Lake, Pennsylvania, despite knowing that Mr. Oz and Direct Diamond had not been residents of Harvey's Lake for over 15 years, along with his knowledge of the fact that Mr. Oz had been out of state during that time, conducting holiday sales to jewelry stores across the country.

20. Section 4(a) of the Agreement states that "Richard Rutta shall be deemed to be the sole legal owner of all diamonds purchased with funds supplied by Richard Rutta along



3

with the original inventory held by Asaf Ben Oz capitalized with the $98,000.00 initial investment, pending their sale which inventory shall be memorialized with ongoing inventory control sheets."

21. Section 4(b) of the Agreement states that "[w]hile Richard Rutta is the sole legal owner of the diamonds, Richard Rutta assigns to the Corporation the exclusive right to possess, to control, to market and to sell that inventory and further recognizes an equity interest held by Asaf Ben Oz arising from his labors in procuring said inventory using his negotiation skills, his industry knowledge, and his network of connections, consistent with and subject to Paragraphs 9 and 10 below. For the purposes of this Agreement, Corporate assets consist solely of the diamond inventory, the good will, the existing computer hardware/software, customer/supplier lists, websites, intellectual property interests including trade and domain names, etc. all being deemed the personal property of Asaf Ben Oz who started the Corporation.

22. Section 9 of the Agreement states as follows: **Termination by Richard Rutta**: This agreement is irrevocable for the first six (6) months. However, if Richard Rutta decides to terminate his participation in the Corporation for whatever reason at any time thereafter, Richard Rutta may elect such termination in his sole discretion after this initial six (6) month trial period. Such election may be made in writing by certified mail, return receipt requested, to Asaf Ben Oz and copied to his legal counsel. That notice shall indicate a choice between the following two exclusive buy-out options:

(a) The Parties shall promptly meet to study the Corporate records to determine the diamond inventory value based upon the costs of purchases, and Asaf Ben Oz shall have two months thereafter in which to secure funding sufficient to purchase the diamond inventory from Richard Rutta. In the event that such funds cannot be provided by Asaf Ben Oz, this option will convert automatically to Option b below.

(b) As soon as reasonably possible after the Corporations receipt of the termination notice, the Shareholders shall meet to establish a new Exhibit A that is complete and accurate as of the date of the termination notice. That inventory shall remain with the Corporation as consignment items entitling Richard Rutta to forty percent (40%) of the gross profit from sales defined as the actual sale price less the Corporate cost of purchase. Periodically after the termination, the Parties agree to meet to study the corporate records and diamond inventory to identify the positively the inventory that has sold, the revenue generated by such sales, and the net profit available for distribution to Richard Rutta. That compensation shall be paid within ten (10) business days following the meeting that establishes the net profit figures.

(c) Regardless of which option above is selected, Richard Rutta's funding obligations and shareholder rights shall automatically and completely terminate five business



4

days following his termination notice to the Corporation and all of his shares shall automatically be vacated by the Corporation and become null and void without any further action by anyone.

(d)  Similarly, regardless of which option above is selected, any diamonds that do not sell within three (3) years of the termination date shall be returned to Richard Rutta by the Corporation for credit against any outstanding debt or for credit according to any other mutually acceptable arrangement.

(e)  Regardless of which option is selected, Richard Rutta would also agree to the non-compete provision in ¶13 of this Agreement.

23. The same day (December 22, 2014) that Rutta Sr. mailed in his resignation and thus, *before the resignation was effectuated and therefore while Rutta Sr. was subject to the terms of the Agreement*, he, through his agent/attorney-in-fact, illegally and without any authority, opened a new sign-on with the Pennsylvania Department of State, and New York Department of State where a branch of the company was registered by IRS laws, and without any authority from the Direct Diamond or its Board of Directors, revised the filing history of Direct Diamond officers and listed himself as President and Mr. Oz as Vice-President and Treasurer. *See* printout from Pennsylvania Corporations Bureau and New York Department of state, Division of Corporations, attached hereto as **Exhibit 3**.  In fact, pursuant to the Agreement, Mr. Oz was always the President of Direct Diamond despite Rutta Sr.'s fraudulent filing.

24. Such actions, taken on the exact same day as the notice that Rutta Sr.'s resignation was allegedly sent (and not yet received and *therefore not yet effective*), were in direct conflict with each other and demonstrate the illegal intentions of Rutta Sr. and prove the pattern of lies, deception, and use of forgery as method of his operation.

25. On January 19, 2015, Rutta Sr. had arranged for and directed Rutta Jr., along with additional individuals including at least one member from his attorney's office, to access Direct Diamond's private vault in New York City.  Utilizing his new title as "President," Rutta Sr. arranged for his son, Rutta Jr., to access the company vault at the New York City Diamond Exchange and personally removed Direct Diamond's diamonds under the guise of an "inventory check."  The attorney, Jack Dean, arranged legal cover for the assault on the inventory.

26. Rutta Jr. gained access to the vault despite an expressly stated email from Mr. Oz, sent to DGA on October 13, 2010, not to ever allow Rutta Jr. into the vault. The email stated, "Please take out list of authorized people to our office the following person:  Jesse Rutta."  Later that day, Mr. Oz received an email in response which stated "Done."



27. ***Nowhere*** in the Agreement is there a clause which allows Rutta Sr. (or Mr. Oz for that matter) the right to declare an insurgence on the inventory and take it for himself, even after resignation. Instead, the inventory was to be handled pursuant to Sections 9(a) and (b) of the Agreement – in either situation, the inventory was to stay "with the Company."

28. Instead, Rutta Sr., along with the assistance of Rutta Jr. and Mr. Dean, took it upon themselves to unilaterally ignore the express terms of the Agreement by storming the vault and stealing the inventory.

29. On January 30, 2015, Mr. Oz, after returning from a long business trip and ***before he received Rutta Sr.'s resignation letter***, arrived at the vault maintained by Direct Diamond at the New York City Diamond Exchange, and found eleven diamonds, valued at approximately $1,000,000.00, missing. *See* inventory of missing diamonds, attached hereto as **Exhibit 4**.

30. To Mr. Oz's shock and dismay, after texting the theft with Jesse Rutta, son of Richard Rutta, Mr. Oz learned of the removal of the diamonds as outlined in the previous paragraphs. Rutta Sr. had absolutely no authorization, pursuant to the Agreement or law, to remove the diamonds.

31. Mr. Oz immediately reported the theft to the New York City Police. *See* copy of New York Police Department complaint for theft, attached hereto as **Exhibit 5**.

32. Mr. Oz was advised to file a police report with Pennsylvania authorities, since the Corporation was a Pennsylvania Corporation. Mr. Oz drove from New York City to Pennsylvania and went to the Dallas Township Police Department and filed complaint on February 2, 2015.

33. Following a lengthy investigation, the Dallas Township Police Department issued a report concluding that a crime was committed. *See* Dallas Township Police Report, attached hereto as **Exhibit 6**.

34. On the same day that the diamonds were stolen from the vault, at his father's direction, Rutta Jr. contacted Cargil Insurance Services ("Cargil") and asked them to send to Rutta Sr. a copy of the insurance policy which insured Direct Diamond's inventory.

35. Mr. Sariel Beckenstein, of Cargil, immediately contacted Mr. Oz and advised him of Rutta Sr.'s request. Direct Diamond's inventory insurance policy issued with coverage on Mr. Oz only, not Mr. Rutta. No one, *aside from Mr. Oz*, was allowed to touch the inventory. *See* email attached hereto as **Exhibit 7**.

6



36. When Mr. Oz returned to Pennsylvania on January 30, 2015 to file the police report, he was served and learned that on January 22, 2015, three days after the theft of the company inventory, Rutta Sr., on his own behalf and on behalf of Direct Diamond Network, instituted a Civil Action in the Court of Common Pleas of Luzerne County, Case No. 15-CV-754 (the "Pennsylvania Litigation") against Mr. Oz. Said suit was filed by Rutta Sr. in Direct Diamond's name despite the fact that he had previously terminated his association with Direct Diamond.

37. The basis of Pennsylvania Litigation was that Mr. Oz allegedly failed to respond to Rutta Sr.'s demand for an accounting, which was requested as part of his resignation letter. Considering, among other things, that Rutta Sr. was fully aware that Mr. Oz was out of town busy pursuing work on behalf of Direct Diamond and had not even received the letter, the allegations in the Pennsylvania Litigation were baseless.

38. The Pennsylvania Litigation also alleged that in response to Mr. Oz's failure to respond to the demand for an accounting, Rutta Sr. and his accomplices took it upon themselves to conduct the accounting on their own by stealing the inventory in Direct Diamond's vault. This was simply a guise to mask the fact that Rutta Sr. and his associates decided to illegally take the diamonds despite without any authority whatsoever.

39. This series of events were nothing more than a scheme by Rutta Sr. to take over Direct Diamond and its diamond inventory and to place Mr. Oz and Direct Diamond in a position of economic hardship, in an effort to illegally seize the inventory of diamonds. The Defendants are still in possession of the inventory of diamonds despite the fact that they (i) were stolen from the vault and (ii) they have no legal right to them.

40. As a result of the Pennsylvania Litigation, and the unjust and immoral result of same, Mr. Oz and Direct Diamond were forced to seek bankruptcy protection and have sustained severe financial damage.

## COUNT I
### (*Conversion against Rutta Sr. and Rutta Jr.*)

41. Plaintiffs hereby repeat and reallege the facts and allegations contained in all the foregoing paragraphs as if set forth herein.

42. Rutta Sr. and Rutta Jr. had an intent and in fact intended to remove and/or steal the diamonds from Direct Diamond's inventory.

43. The Agreement provided that Rutta Sr. would be the sole legal owner of all diamonds purchased with funds supplied by him. However, Paragraph 4(b) of the Agreement specifies that Rutta Sr. assigned to Direct Diamond the exclusive right to


possess, to control, to market and to sell that inventory, recognizing further the equity interest held by Mr. Oz and Direct Diamond.

44. Rutta Sr. had no legal right to the inventory.

45. Rutta Sr. and Rutta Jr. interfered with the diamonds, to the exclusion of Mr. Oz's ownership rights, by removing/stealing the diamonds from the inventory.

46. Rutta Sr. and Rutta Jr. are now in possession of the diamonds, when legal possession belongs solely to Plaintiffs.

## COUNT II
### (*Conspiracy to Misappropriate against Rutta Sr. and Rutta Jr.*)

47. Plaintiffs hereby repeat and reallege the facts and allegations contained in all the foregoing paragraphs as if set forth herein.

48. Rutta Sr. and Rutta Jr. acted tortiously and in concert with each other as alleged above, pursuant to a common design.

49. Rutta Sr. knew or should have known that the conduct that he solicited his son to commit constituted a misappropriation of corporate assets, breach of contract, and a breach of fiduciary duties that he owed to Plaintiffs. Yet, he provided substantial guidance, assistance, and encouragement to his son to commit the misappropriation of the diamonds.

50. Rutta Sr. ratified and adopted his son's acts done for his and Rutta Jr.'s exclusive benefit.

#

## COUNT III
### (*Breach of Contract against Rutta Sr.*)

51. Plaintiffs hereby repeat and reallege the facts and allegations contained in all the foregoing paragraphs as if set forth herein.

52. Paragraph 26 of the Agreement explicitly provides the standards of conduct for the Shareholders: "Good Faith: The Shareholders intend and agree that their respective rights, duties, powers, liabilities, obligations, and discretionary acts shall be performed, carried out, discharged, exercised reasonably in good faith and in fair dealing with the other Shareholder and with the Corporation."

53. Rutta Sr. radically breached Paragraph 26 of the Agreement.

8



54. Despite demands made by Mr. Oz, Rutta Sr. has failed to remedy his wrongful conduct, which is contrary to the Agreement.

55. Rutta Sr.'s various failures to comply with the Agreement constitute material breaches of it.

56. As a result of Rutta Sr.'s breach of the Agreement, Plaintiffs have sustained substantial financial damages.

### COUNT IV
### (*Breach of Covenant of Good Faith and Fair Dealing against Rutta Sr.*)

57. Plaintiffs hereby repeat and reallege the facts and allegations contained in all the foregoing paragraphs as if set forth herein.

58. Rutta Sr.'s actions constitute a breach of the covenant of good faith and fair dealing which is present in all contracts.

59. As a direct and proximate result of Rutta Sr.'s actions alleged above, Plaintiffs have sustained substantial financial damages.

### COUNT V
### (*Breach of Fiduciary Duty against Rutta Sr.*)

60. Plaintiffs hereby repeat and reallege the facts and allegations contained in all the foregoing paragraphs as if set forth herein.

61. Rutta Sr. owed Plaintiffs a fiduciary duty of loyalty, good faith, and fair dealing as a shareholder, director, and officer of Direct Diamond.

62. Rutta Sr. owed Plaintiffs a duty not to steal corporate diamond inventory or deal with Plaintiffs in an unfair, dishonest, or otherwise improper manner.

63. Rutta Sr. breached his fiduciary duties as alleged in this complaint.

64. Rutta Sr.'s breach of his fiduciary duties has caused and continues to cause direct, proximate, and substantial harm to Plaintiffs.

9



## COUNT VI
***(Tortious Interference with Business Relations against Rutta Sr. and Rutta Jr.)***

65. Plaintiffs hereby repeat and reallege the facts and allegations contained in all the foregoing paragraphs as if set forth herein.

66. Plaintiffs regularly and consistently marketed and sold diamond inventory on their internet platform, and Rutta Sr. and Rutta Jr. were aware of Plaintiffs' regular business dealings with various buyers of diamond inventory. Therefore, when Rutta Sr. and Rutta Jr. wrongfully misappropriated all of Direct Diamond's inventory, they interfered with Plaintiffs' ongoing and future sales to their customers.

67. The Defendants, either intentionally and knowingly or with substantial certainty as to the consequences to Plaintiffs, interfered with Plaintiff' ongoing and future contractual dealings with their diamond customers.

68. As a direct and proximate result of Defendants' conduct as alleged above, Plaintiffs have sustained substantial financial damages.

## COUNT VII
***(Usurpation of Corporate Opportunity against Rutta Sr. and Rutta Jr.)***

69. Plaintiffs hereby repeat and reallege the facts and allegations contained in all the foregoing paragraphs as if set forth herein.

70. Rutta Sr. and Rutta Jr. knew of the various corporate opportunities presented to Plaintiffs had the diamonds stayed in the inventory of Direct Diamond.

71. The corporate opportunities were directly in line with Direct Diamond's business.

72. Direct Diamond had an express interest in the corporate opportunities provided when it had the diamonds in its inventory.

73. Rutta Sr. and Rutta Jr. took the opportunity for their own by misappropriating/stealing the diamonds in the inventory.

74. As a direct and proximate result of Defendants' conduct as alleged above, Plaintiffs have sustained substantial financial damages.

10



## COUNT VIII
### (*Negligence as Bailee against DGA*)

75. Plaintiffs hereby repeat and reallege the facts and allegations contained in all the foregoing paragraphs as if set forth herein.

76. DGA, who is paid thousands of dollars per month by the Plaintiffs to safeguard the diamonds and as the bailee to Plaintiffs, had a duty to use ordinary care in securing the inventory in the vault.

77. DGA breached that duty by allowing Rutta Jr. into the vault, which led to the theft of the diamond inventory in the vault.

78. DGA further breached that duty by allowing Rutta Jr. into the vault despite the express direction given by Mr. Oz in October 2010 to never allow Rutta Jr. into the vault.

79. DGA failed to exercise due care in safeguarding the diamonds, which led to Rutta Jr. ultimately stealing the diamond inventory from the vault.

80. As a result of DGA's negligence, the Plaintiffs have sustained severe financial damage.

## JURY CLAIM

The Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1. All actual, compensatory, and incidental damages;
2. Punitive damages;
3. Prejudgment and post-judgment interest;
4. An order directing all of the stolen inventory to be returned to Direct Diamond; and
5. Any other orders this court deems just and appropriate.



Dated: Fairfield, Connecticut
       January 13, 2021

PLAINTIFFS: ASAF BEN OZ and DIRECT DIAMOND NETWORK, INC.

By: */s/ Michael A. Zamat*
    Michael A. Zamat
    **PETERSON ZAMAT, LLC**
    535 Fifth Avenue, 25th Floor
    New York, NY 10017
    **********************
    1275 Post Road, Suite 200-D
    Fairfield, CT 06824
    Telephone: 203.292.9798
    Facsimile: 203.774.1155
    Michael@petersonzamat.com

*Counsel for Plaintiffs*

